Philip W. Conrad and Estate of Beulah Conrad, by Philip W. Conrad, Executor v. Commissioner.
Conrad v. Commissioner
Docket No. 1148-63.
United States Tax Court
T.C. Memo 1965-149; 1965 Tax Ct. Memo LEXIS 183; 24 T.C.M. (CCH) 790; T.C.M. (RIA) 65149; May 27, 1965
*183 1. The amount of a casualty loss for residence property located in Cuba and owned by United States citizens and expropriated by Castro government is determined. Sec. 165(i), I.R.C. of 1954. 2. Held, petitioners failed to substantiate claimed medical expenses in excess of 3 percent of their gross income. 3. Held, further, no issue is presented with respect to a claimed interest expense deduction since it was not specifically disallowed in the notice of deficiency. John J. Conroy, 185 Devonshire St., Boston, Mass., for the petitioners. John R. Berman, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined a deficiency *185 in petitioners' income tax for 1960 in the amount of $1,615.75. The issues which remain unsettled derive from deductions for casualty loss, medical expenses, and an interest payment taken in petitioner's 1960 income tax return. Findings of Fact Philip W. Conrad and Beulah Conrad (now deceased) were husband and wife, and they filed their joint Federal income tax return for 1960 with the district director of internal revenue, Chicago, Illinois. The petitioners are Philip and the estate of his wife, but our use of the term "petitioners" will at times include Beulah. In early 1956 petitioners were living in Provincetown, Massachusetts, and Philip was the retired president of a Chicago corporation. Later that year they moved to a 3-bedroom house in Yarmouth Port, Massachusetts, and still later the same year Philip purchased real estate located in the City of Trinidad, Province of Las Villas, Cuba, and they moved to Trinidad with all of their household furniture and equipment. The deed for the real estate Philip purchased in Trinidad was recorded in the Registro de la Propiedad de Trinidad, Asiento No. 591, Folio 251, on October 25, 1956. It was stated in said deed that Philip W. Conrad *186 paid 4,000 pesos ($4,000) for said real estate. The house located on said real estate was an old Spanish colonial house in a dilapidated condition. Philip had to put a completely new roof on the house. He built an air conditioned wing with two bedrooms and two baths, rebuilt the patio and retiled the floors. He installed new plumbing and modernized the kitchen. The work was all done by Philip, hiring men who had the capacity to do the work rather than using subcontractors. The work was started in the spring of 1957 and it took nearly a year to complete and during this time Philip and Beulah lived in another house in Trinidad owned by some American friends. Shortly after Castro came to power in Cuba petitioners came to the conclusion that it would be wise for them to leave Cuba for a time. They left with three or four suitcases by plane, leaving the man who had served as their chauffeur and man of all work in charge of their home. They went to Ajijic, Mexico, where they lived until some time in 1961. They both became sick in Ajijic with dysentery and they wrote Beulah's brother to come and get them. They left Mexico sometime in 1961 and Beulah died of cancer in January of 1962. *187 In their income tax return for 1960 petitioners reported salary income of $6,958.52 and other income of $2,939.20, or a total of $9,897.72, and the following itemized deductions on page 2 of the return: Interest (Loan)
$ 480.00
Medical and Dental Expense
810.00
Other Deductions - Investment Ad-
visory Fee
394.39
Preparation of Tax Return
150.00
House, Land and Furniture in
Trinidad, Cuba (Expropriated
by Castro Government)
30,000.00
Total deductions
$31,834.39
In this return petitioners also took a long-term bad debt loss deduction in the amount of $2,600, but it was stipulated at the trial they were not entitled to this deduction. In his notice of deficiency respondent disallowed the bad debt loss and the deductions for casualty loss and medical expense, the notice stating: Failure to substantiate medical expense,
bad debt, and loss of house, land and fur-
niture in Trinidad, Cuba, results in recom-
putation of income tax liability without
benefit of these deductions. The standard
deduction is allowed in adjustment.
Page 2 deductions
$31,834.39
10% A.G.I. allowed
989.77
Net increase
$30,844.62
Opinion
*188 Section 165, Internal Revenue Code of 1954, provides generally in section 165(a) for the allowance as a deduction of "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(b) provides the amount of such deduction for any loss "shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." When the losses are of an individual's property that is not connected with a trade or business the deduction is limited to losses that "arise from fire, storm, shipwreck, or other casualty, or from theft." Section 165(c)(3), Internal Revenue Code of 1954. In 1964 there was added section 165(i) which we have set forth in a footnote below. [1] It added losses by United States citizens of certain Cuban property held by them on December 31, 1958 and later confiscated by the government of Cuba, to the list of deductible losses. It is admitted petitioners satisfy the citizenship qualification of section 165(i) and that the property located in Cuba was held by them on December 31, 1958 and later expropriated by the Cuban government. That leaves *189 the question of what was the fair market value of the property on December 31, 1958. (Section 165(i)(2)(B)). *190 On brief respondent states the only question presented with respect to the casualty loss is as follows: For the purpose of determining the amount of a casualty loss, what is the fair market value of property located in Cuba and owned by the petitioners as of December 31, 1958, which property was expropriated by the Cuban government, where petitioners have failed to present documentation in support of the claimed loss? Respondent is somewhat critical of petitioner's testimony in that it is mostly designed to show cost to petitioners rather than fair market value. We think in the circumstances of this case evidence of cost would be relevant to our determination of value. Cf. Estate of Frank Miller Gould, 14 T.C. 414; Guggenheim v. Rasquin, 312 U.S. 254. It is true as respondent argues that there is but little "documentation" to support the amount of casualty loss. Philip in his testimony gave a rough breakdown of his determination of $30,000 total casualty loss using cost figures as he remembered or estimated them. He said he spent $7,000 or $8,000 to acquire the property and $12,000 to $15,000 for plumbing, furniture, electrical work, putting in tiles, *191 rebuilding the roof, building the new wing, air conditioning and modernizing the kitchen. To this he added his estimate of the cost of the pieces of furniture (many of them antiques) he brought to Cuba from Provincetown in the amount of $5,000 to $8,000. It is stipulated petitioners' deed recites 4,000 pesos ($4,000) consideration. Philip testified he paid between $7,000 and $8,000 to acquire the property. The deed had been sent back to his lawyers in Boston and it was available at the time of trial. Philip had no explanation of the recitation in the deed of 4,000 pesos as the purchase price and his testimony of $7,000 or $8,000 paid to acquire the property, except to say that he paid persons other than the seller. His testimony of the extensive rebuilding and repairs that the building underwent is rather well corroborated by a series of photographs. The first picture shows the property in its original dilapidated condition and Philip testified this picture was taken by him at the time he bought it. Six or seven other pictures show the property when part of the restoration work was completed and after it was all completed. Philip testified that when they fled Cuba they left *192 their records behind and his testimony with respect to the cost of reconstruction and repairs was his best recollection of those costs. The pictures prove extensive reconstruction work was done. Philip's testimony was not always consistent. Sometime furniture purchased in Cuba seemed to be lumped with reconstruction costs. The closest approximation we can make from all of the evidence with respect to reconstruction costs is $12,000 and the cost of furniture bought in Cuba, $2,000. Philip's estimate of the cost of furniture brought from Provincetown to Cuba was not less than $5,000. Here the cost and especially an estimate of cost for purchases made in earlier years can hardly be said to be equivalent to value in 1958. There was no description of the pieces except to say some were antiques. Without further discussion our best approximation for this furniture is $2,000. We fix the original cost of the property at $4,000 for the purpose of determining the fair market value. Philip used a figure of "between 7 and $8,000." He does not say that he paid the seller more than the $4,000 recited in the deed but he hints there were "various people had to be paid. That is the way it is done *193 in Cuba and in many Latin countries." We do not know exactly what he means and we are given no further explanation. If he means that, in order to make the purchase, he had to make some sort of payoff to officials or persons who had power to stop the purchase, the amounts of such payments would probably not reflect value. The foregoing means we fix petitioners' casualty loss for the year 1960, or the fair market value of the property taken, in the total amount of $20,000, made up of $4,000 original cost, $12,000 reconstruction costs, $2,000 Cuban furniture and $2,000 American furniture. Page 2 of Form 1040 contains a box for the entry of a taxpayer's medical and dental expense and instructions and lines for the computation of the allowable amount of such expense as a deduction. It contains directions to the user: "(Submit itemized list. Do not enter any expense compensated by insurance or otherwise)". In the return for 1960 executed by both Philip and Beulah there is merely the total deduction of $810. Petitioners did not exclude 3 percent of gross income from the $810 and did not submit any itemized list. Philip testified he and his wife were sick while living in Mexico in 1960 *194 but that when they left their records behind and were never able to recover them. There was not a word of testimony giving the name of any doctor who treated either of them in 1960. Philip said they were hospitalized in Mexico but not even the name of the hospital was mentioned. Petitioners argue the deduction is substantiated by two letters he wrote to his Boston tax attorney in January of 1961 wherein he instructed him with respect to his income tax return. In one he said they had had $810 medical expense not covered by Blue Cross and Blue Shield and in the other he referred to medical expenses as $850.00 more or less" to which should be added amounts paid for Blue Cross and Blue Shield. He said his records were available when he wrote these letters but the letters do not indicate he used them. They show he was estimating the medical expenses and even the Blue Cross or Blue Shield payments. The letters add nothing by way of substantiation. There was total disregard of the directions on the return form and complete failure of petitioners' burden of substantiating the disallowed medical expense payments in excess of 3 percent of their adjusted gross income. We hold for respondent *195 on this issue. Respondent argues on brief "petitioners have failed to substantiate the amount, if any, to which they are entitled as an interest expense deduction." But we do not find any issue presented with respect to the interest deduction. This deduction was not specifically disallowed in respondent's notice. We have set forth the pertinent portion of the notice in our findings. Nowhere in the notice is there any mention made of the claimed interest deduction. What respondent did with respect to the claimed page 2 deductions on the return was disallow the medical expense item of $810 and the casualty item of $30,000. The remaining deductions for interest, $480; investment advice services, $394.39 and preparation of return, $150, would total $1,024.39. No mention is made of any of these items in the notice but respondent in his notice proceeded to compute the tax using the standard deduction figure or $989.77. One cannot tell from this notice which of the above three items were disallowed or whether all three were disallowed. The disallowance of any one would justify his use of the standard deduction but the failure to disallow any of the three would not justify using the standard *196 deduction which was less than the sum of the three unmentioned items. At the time of trial it was stipulated petitioners were entitled to the deduction of $394.39 for investment advisory fees and $150 for preparing the return. We do not find the notice of deficiency placed the interest deduction in issue. Consequently, petitioners had no burden to substantiate the deduction. Decision will be entered under Rule 50. Footnotes
1. (i) Certain Property Consficated by the Government of Cuba. - (1) Treatment as subsection (c)(3) loss. - For purposes of this chapter, in the case of an individual who was a citizen of the United States, or a resident alien, on December 31, 1958, any loss of property which - (A) was sustained by reason of the expropriation, intervention, seizure, or similar taking of the property, before January 1, 1964, by the government of Cuba, any political subdivision thereof, or any agency or instrumentality of the foregoing, and (B) was not a loss described in paragraph (1) or (2) of subsection (c), shall be treated as a loss to which paragraph (3) of subsection (c) applies. In the case of tangible property, the preceding sentence shall not apply unless the property was held by the taxpayer, and was located in Cuba, on December 31, 1958. (2) Special rules. - (A) For purposes of subsection (a), any loss described in paragraph (1) shall be treated as having been sustained on October 14, 1960, unless it is established that the loss was sustained on some other day. (B) For purposes of subsection (a), the fair market value of property held by the taxpayer on December 31, 1958, to which paragraph (1) applies, on the day on which the loss of such property was sustained, shall be its fair market value on December 31, 1958. (C) For purposes of section 172, a loss described in paragraph (1) shall not be treated as an expropriation loss within the meaning of section 172(k). * * *↩